**Rosie WATTS and Robert L. Watts, Plaintiffs-Appellants,**

v.

**KEY DODGE SALES, INC., et al., Defendants-Appellees.**

No. 82–3374.

United States Court of Appeals, Fifth Circuit.

June 20, 1983.

Rehearing and Rehearing En Banc Denied Sept. 12, 1983.

848

Matthews & Breeden, Patrick D. Breeden, New Orleans, La., for plaintiffs-appellants.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, David M. Culpepper, James K. Irvin, New Orleans, La., for Chrysler Credit Corp.

Before CLARK, Chief Judge, THORNBERRY and RANDALL, Circuit Judges.

THORNBERRY, Circuit Judge:

## I. *Introduction:*

This is an appeal by Rosie and Robert Watts (the Watts) from a judgment by the district court that defendants Key Dodge Sales, Inc. and Chrysler Credit Corp. (the creditor) did not violate the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.,* and Regulation Z of the Federal Reserve Board (the Board), 12 C.F.R. § 226.1 *et seq.* We affirm in part, and reverse in part.

## II. *Facts and Disposition Below:*

On December 8, 1979, the Watts purchased a new 1980 Dodge Van from Key Dodge Sales for family and household use. As part of the sales transaction, the Watts and Key Dodge executed a "Sale and Chattel Mortgage" instrument which contained both a promissory note and a disclosure statement. This instrument was subsequently assigned to Chrysler Credit. At trial, the Watts alleged three violations of the TILA and Regulation Z by the creditor: failure to include the notarial fee in the finance charge; ambiguity of the disclosure providing for the delinquency charge; and invalidity of the waiver of all exemption clauses in the promissory note and disclosure statement. The district court, relying on two unpublished opinions,[1] granted the creditor's motion for summary judgment.

1. *Clark v. Star Chrysler Plymouth Sales, Inc. and Chrysler Corp.,* No. 80–359 (E.D.La. Jan. 8, 1982), and *Marroy v. Key Dodge Sales, Inc.,* No. 80–1437 (E.D.La. Jan. 15, 1982).

2. Although we need not address the issue whether a notary public, although not an elected official, is nevertheless a "public official" for

## III. *Analysis*

We begin by outlining the standard of review governing this appeal. In affirming a grant of summary judgment, an appellate court must satisfy itself that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c).

The Supreme Court has used the following language to emphasize the way in which the reviewing court should evaluate the record on an appeal from a summary judgment: "on summary judgment the inferences to be drawn from the underlying facts contained in such materials [affidavits, depositions, and exhibits] must be viewed in the light most favorable to the party opposing the motion" and "we look at the record on summary judgment in the light most favorable to * * * the party opposing the motion * * *"

10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2716, at 643 (1983) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) and *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). *See Wilson v. Taylor,* 658 F.2d 1021, 1028 (5th Cir.1981).

## A. *The Notarial Fee:*

Under the TILA and Regulation Z, the creditor must disclose all finance charges imposed by him and payable directly or indirectly by the consumer. 15 U.S.C. § 1638(a); 12 C.F.R. § 226.4(a). One exception from this broad rule is "[f]ees and charges *prescribed by law* which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction." 12 C.F.R. § 226.4(b)(1) (emphasis added).[2]

the purpose of Regulation Z, we note that the district courts in this circuit have treated notaries as public officials under Regulation Z. *See Williams v. Bill Watson Ford, Inc.,* 423 F.Supp. 345, 347 (E.D.La.1976); *George v. General Finance Corp. of La.,* 414 F.Supp. 33, 35 (E.D.La. 1976).

Under Louisiana law, a chattel mortgage must be authenticated by a notary public. La.Rev.Stat.Ann. § 9:5353 (West Supp.1982). However, Louisiana law does not prescribe the amount of the fee a notary may legally charge. The disclosure statement furnished to the Watts listed a $3.50 charge for notarial fees under "other charges." Since the fee a notary may charge is not prescribed by law, the Watts contend that it falls without the exemption for fees and charges prescribed by law set out in 12 C.F.R. § 226.4(b)(1), *supra*. They argue that the $3.50 notarial fee they paid should have been included in the finance charge, and that the creditor's failure to do so constitutes a violation of the TILA and Regulation Z. The creditor contends that because Louisiana law requires notaries to authenticate documents like those at issue here, the notarial fee is "prescribed by law" and therefore falls within the section 226.-4(b)(1) exemption.

The Watts do not dispute the holding of *George v. General Finance Corp., supra,* 414 F.Supp. at 35, that the amount of the notarial fee need not be included in the finance charge as long as it is set forth elsewhere in the disclosure statement. The district court in *George* rejected an argument identical to that advanced by the Watts, i.e. that in order for a fee to be "prescribed by law" within the meaning of section 226.4(b)(1), the *amount* of the fee must be prescribed by statute, basing its holding on the premise that a creditor has no control over charges such as the notarial fee. *Id. See also Williams v. Bill Watson Ford, Inc.,* 423 F.Supp. at 347. Rather, the Watts contend that the rule set forth in *George* was administratively overruled by an unofficial interpretation of section 226.-4(b)(1), written by one of the Board's staff attorneys, which adopted the views held by the Watts, and expressly rejected the views underlying *George, supra.* In order to resolve this issue, we must therefore determine the proper weight to be accorded unofficial staff interpretations by federal courts.

In *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the Supreme Court held that "unless demonstrably irrational, Federal Reserve Staff opinions construing the [TILA] or Regulation [Z] should be dispositive. . . ." *Id.* at 797. In that case, the Court relied on official staff opinions by the Board published in the Federal Register, and held that they were dispositive of the issue before it. In so doing, the Court clearly distinguished unofficial interpretations, stating that: "12 C.F.R. § 226.1(d) (1979) authorizes the issuance of official staff interpretations that trigger the application of [15 U.S.C.] § 1640(f). . . . *Official* interpretations are published in the Federal Register, and opportunity for public comment may be requested. 12 C.F.R. § 226.1(d). *Unofficial interpretations have no special status under § 1260(f)."* 100 S.Ct. at 798 n. 10 (emphasis added).

In *Anderson Brothers v. Valencia,* 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981), the Supreme Court again looked to staff interpretation in seeking to resolve the issue before it. Although a relevant Official Staff Interpretation had been published for comment in the Federal Register, the Board itself had not passed on that Interpretation, deciding to defer to the Supreme Court disposition of the case. While noting that "we cannot agree that the staff's views expressed in the proposed ruling are wholly without significance," 101 S.Ct. at 2270, the Court nonetheless did not rest its holding on the Staff Interpretation, 101 S.Ct. at 2272, but instead resolved the case on the basis of the recent amendments to the TILA.

Relying on *Milhollin,* this court, in *Smathers v. Fulton Federal Savings & Loan Association,* 653 F.2d 977 (5th Cir.1981), used an official letter issued by the assistant director of the Board as a basis for overruling a contrary prior circuit court decision. 653 F.2d at 980–81. Concluding that the letter's interpretation of a section of the TILA was not demonstrably irrational, we held the letter to be dispositive of the issue before us. *Id.* In *Lyles v. Commercial Credit Plan Consumer Discount Co.,* 660

F.2d 129 (5th Cir.1981), we rejected the argument that unofficial staff interpretations are not entitled to any weight, noting that: "[A]dministrative views, official or unofficial, offer *helpful guidance*." 660 F.2d at 132 (emphasis added). We relied on both official and unofficial staff interpretations in our disposition of that case. We think it significant that in the quoted passage above, we did not state that unofficial, as well as official, staff interpretations are entitled to the "demonstrably irrational" standard of *Milhollin*.

In *Bury v. Marietta Dodge*, 692 F.2d 1335 (11th Cir.1982), the Eleventh Circuit has set forth what we believe to be the proper view of the weight to be accorded different classes of administrative interpretations in light of the Supreme Court and our precedents:

> Bury argues that in light of *Smathers*, this court should now give precedential value to all staff interpretations by members of the Federal Reserve Board. We do not agree. *Smathers* is easily distinguishable from the case at hand. In *Smathers*, the court relied upon a published, numbered letter by the assistant director of the Federal Reserve Board. Kluckman issued the letter in his official capacity as the assistant director of the Board. It is reasonable to assume that the letter therefore has the status of an official staff interpretation, especially as it is published and numbered by the Federal Reserve Board. In this case, we are dealing with an unnumbered, unpublished letter by a staff attorney. There is nothing to indicate that the Federal Reserve Board as a body approves of the interpretation of the regulation as expressed in the letter, or even knows of the interpretation as expressed in the letter. Although the two letters were approved by section chiefs, we cannot assume that approval by a section chief is to be given the same weight as that of the assistant director of the entire Federal Reserve Board.
>
> Bury is correct in stating that if we give the two letters of the staff attorneys the same weight as official staff interpretations of the Federal Reserve Board, these Board letters would have the effect of overruling *Whitfield v. Termplan* [651 F.2d 383 (5th Cir.1981)]. We cannot allow this result, because it would then follow that any attorney of the Federal Reserve Board could write a letter indicating his own private interpretation of a regulation or statutory provision, indicate in the letter that he feels his interpretation to be indicative of the Federal Reserve Board's interpretation of the statute, and thereby, automatically reverse any court's decision which holds otherwise. If we follow Bury's reasoning, a court can be controlled by staff interpretations which need not be published. A staff attorney could write a letter, keep it in his desk, and yet produce a letter which would control each court in the nation. We cannot believe that this is the result which the Supreme Court intended.
>
> As the Supreme Court said in *Milhollin*, the opinions of members of the Federal Reserve Board should be given considerable weight unless they are "demonstrably irrational." *Milhollin*, 444 U.S. at 565, 100 S.Ct. at 797. To give controlling weight to a staff letter by an attorney on the Federal Reserve Board, writing to anyone in the country as to his interpretation of statutory construction, would produce a demonstrably irrational result, and is therefore not the path which we choose to follow. We believe that the Supreme Court has dictated that we follow official staff interpretations of the Federal Reserve Board, and we do not believe the two letters appended to Bury's motion to alter judgment to be official staff interpretations.

660 F.2d at 1339–40. We adopt this approach by our sister circuit. Consistent with *Lyles*, we now hold that unofficial, unpublished staff interpretation letters are not entitled to the demonstrably irrational standard of review, but merely offer "helpful guidance" to a reviewing court.

Applying this principle to the facts of our case, we decline the invitation to overrule

the holdings announced in *Williams* and *George, supra,* which formed the basis for the trial court's holding in our case. Here, as in *George,* the existence and amount of the notarial fee is readily ascertainable from an examination of the disclosure statement. Furthermore, the creditor has no control over either the amount, or the imposition of this fee. See 12 C.F.R. § 226.4(a) (detailing the nature of charges required to be disclosed as finance charge); *George,* 414 F.Supp. at 35. As in *Bury,* there is no indication here that the unofficial staff letter has the formal approval of the Board. Absent such approval, the letter does not carry the weight required to overrule the district court's interpretation of the relevant Louisiana statute. We hold that the creditor did not violate the TILA or Regulation Z by not including the notarial fee as part of the finance charge.

### B. *The Delinquency Charge:*

Paragraph 12 of the Disclosure Statement provides:

> 12) *Delinquency Charges:* Seller may collect, and Buyer hereby agrees to pay, a delinquency . . . charge on any installment which shall not have been paid within *10* days after the date on which it becomes due and payable, in an amount not exceeding *5% of each such unpaid installment or $5.00,* whichever is less . . . . (emphasis added)

Similarly, the promissory note provides that the delinquency charge be "in an amount not in excess of 5% of each such installment, or $5.00, whichever is less . . . ." The Watts contend that the creditor violated the TILA and Regulation Z by failing to disclose the delinquency charge due in the event of partial payment by the debtor. Specifically, the Watts maintain that the delinquency charge provision is ambiguous because a reasonable debtor reading that provision could not determine whether the creditor was entitled to impose a delinquency charge of 5% of the *full* amount of the installment, or merely 5% of the unpaid balance. The creditor argues that the delinquency provision clearly entitles it to im-

pose a 5% charge *solely* on that portion of the installment which remains unpaid ten days past the due date. However, a careful reading of the delinquency provision leads us to the conclusion that it allows the creditor to impose a 5% charge on the full amount of any unpaid, or partially paid, installment. At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z.

Regulation Z provides that the creditor disclose to the customer "[t]he amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments." 12 C.F.R. § 226.8(b)(4). The district court relied on *Marroy, supra,* note 1, in disposing of this issue. In *Marroy,* the court held that an identical delinquency charge provision did not violate the TILA or Regulation Z. The court based its conclusion on the premise that "[i]f creditors were required to disclose the amount of every possible speculative charge, the complexity of these statements could likely cause the debtor to be lost in detail and thus would do a disservice to the goals of the TILA." We reject this argument.

Although the TILA and Regulation Z do not require that a disclosure statement provide for every improbable eventuality, where a disclosure statement does provide for one such eventuality, that of default, it must clearly set out the method of computing the resulting delinquency charge. Moreover, a clear and unambiguous provision could readily be fashioned in our case. For example, we think that the following provision would satisfy the goals of the TILA and Regulation Z, as well as the need for simplicity:

> [A defaulting debtor shall pay] 5% of the unpaid amount of the installment in default, not to exceed $5.00.

We therefore hold that the delinquency charge provisions in the disclosure statement and promissory note are vague because they fail to provide for the amount or method of computation of delinquency charges in the likely event of a partial payment by a debtor.

*C. Waiver of Exemptions:*

 Paragraph 6, which appears on the back of the promissory note, provides as follows: "Buyer declares that the property is owned in excess of all exemptions granted by law. All exemptions permitted to be waived are hereby waived by Buyer and Buyer assigns all rights thereunder to Seller." Regulation Z requires that the creditor disclose to the debtor any security interest by providing a "description or identification of the type of any security interest." 12 C.F.R. § 226.8(b)(5). Louisiana law exempts from seizure items of personal and real property such as clothing, bedding, tools of the trade, and 75% of the weekly disposable earnings. La.Rev.Stat.Ann. § 13:3881 (West Supp.1982). Moreover, Louisiana law exempts from seizure all homesteads up to $15,000. La.Rev.Stat. Ann. § 20:1 (West Supp.1982).

The Watts contend that the waiver of their state law right to exemption from seizure of the homestead and other property constituted a security interest that had to be disclosed under Regulation Z. *See Elzea v. National Bank of Georgia,* 570 F.2d 1248, 1250 (5th Cir.1978); *Hamilton v. Southern Discount Co.,* 656 F.2d 150 (5th Cir.1981). The district court, again adopting the analysis of the court in *Marroy,* held that the waiver did not create a security interest which had to be disclosed because it did not extend to *all* of the Watts' exempted property, but only to the automobile, the mortgaged property. The court below achieved this result by reading the waiver of exemptions sentence in conjunction with the preceding sentence, which discussed "the property." We disagree. First, we think that a fair reading of Paragraph 6 would permit a creditor to assert a claim to all property owned by a debtor, and currently exempt from seizure under state law. Moreover, this Court has recently addressed precisely this issue in *Stewart v. Abraham Lincoln Mercury, Inc.,* 698 F.2d 1289 (5th Cir.1983), and in *Bradley v. Marshall Brothers Lincoln Mercury, Inc.,* 698 F.2d 1286 (5th Cir.1983). In those cases, we held that a similar waiver of "all exemptions" violated the TILA and Regulation Z because the unsettled na-

ture of the law in Louisiana regarding the validity of a total waiver would enable a creditor "to bring a deficiency judgment action seeking to reach the very property itemized above." *Stewart,* 698 F.2d at 1295. We also voiced concern over "an unscrupulous creditor using this language as a club against a poorly informed debtor." 698 F.2d at 1295 n. 6. Since we see no material difference between the waiver in this case and those in *Stewart* and *Bradley,* we adopt their analysis, and hold that the waiver of exemptions provision here violated the TILA and Regulation Z.

*IV. Conclusion:*

For the reasons stated above, the judgment of the district court is affirmed in part, and reversed in part. Costs shall be taxed one-third against the Watts, and two-thirds against the Creditor.